**UNITED STATES DISTRCT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GEMINI INSURANCE COMPANY and | ) | |
| BERKLEY PROGRAM | ) | |
| SPECIALISTS, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 16 C 2780 |
| | ) | Hon. Marvin E. Aspen |
| v. | ) | |
| | ) | |
| PELICAN GENERAL INSURANCE | ) | |
| AGENCY, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

Plaintiffs Gemini Insurance Company ("Gemini") and Berkley Program Specialists, LLC ("Berkley") bring this diversity action against Pelican General Insurance Agency, LLC ("Pelican") alleging claims of breach of contract, contractual indemnification, negligence, and negligent misrepresentation. (Am. Compl. (Dkt. No. 6).) Plaintiffs have filed a motion for partial summary judgment as to liability on all four claims pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, we hereby grant Plaintiffs' motion for summary judgment for their breach of contract and indemnification claims (Counts I and II) and deny their motion as it pertains to their negligence and negligent misrepresentation claims (Counts III and IV).

## BACKGROUND

Plaintiffs Berkley and Gemini are insurance companies; at all relevant times, Berkley has been Gemini's manager with the authority to enter into contracts on Gemini's behalf. (Pls.' Statement of Material Facts ("SOF") (Dkt. No. 29) ¶¶ 1, 12.) Plaintiffs' relationship with an

insurance program administrator, Pelican, and a commercial auto insurance policy issued by Pelican give rise to this suit.

## I. Plaintiffs' Relationship With Pelican

In 2003, Pelican began serving as program administrator for Plaintiffs' commercial auto program in Louisiana.  (*Id.* ¶ 10.)  On April 1, 2005, Pelican entered into a Program Administrator Agreement ("PAA") under which Pelican agreed to write commercial automobile insurance policies on Gemini insurance paper in Louisiana and Arkansas.  (*Id.* ¶¶ 11, 16.)  The PAA sets forth Pelican's ability to quote, underwrite, and issue insurance policies and endorsements, and provides limitations to Pelican's authority.  (*Id.* ¶¶ 14–15.)  Specifically, Section 3.1 of the PAA reads: "Administrator [Pelican] will not solicit, transact, quote, underwrite, rate, or bind policies on . . . risks which are unacceptable in accordance with this Agreement, or the underwriting guidelines, procedures, instructions, or memoranda provided to Administrator by Company [Berkley] from time to time . . . ."  I (*Id.* ¶ 15.)  Section 1 states the "Administrator agrees to comply with and be bound by" any "underwriting guidelines . . . setting out certain policies of Company," that may be revised "without the need to amend this Agreement and shall be effective upon written notice to Administrator."  (*Id.* ¶ 14.)  In the event Administrator "quotes, underwrites, . . . or binds policies as prohibited by Section 3.1 . . . without the prior written approval of Company, whether intentional or not, Administrator will immediately . . . take such actions as are necessary to remove or to minimize the Company's exposure as an insurer on such unacceptable risks. . . ."  (*Id.* ¶ 15.)  Further, the PAA includes indemnity provisions in Sections 3.2 and 8.2, which provide that the "Administrator shall indemnify and hold the Company harmless for any and all payments that the Company may be required to make under policies which are prohibited by Section 3.1," and shall "defend, indemnify, and hold Company harmless from and against all claims, actions, causes of action,

liability, or loss which result from any real or alleged negligent or willful acts, errors, or omissions or [sic] Administrator, or the servants, employees, representatives, producers, or brokers of Administrator . . . ."  (*Id.*)

On June 1, 2013, Plaintiffs issued new underwriting guidelines ("UWGs") for commercial automobile policies Louisiana and Arkansas.  (*Id.* ¶ 17; UWGs (Dkt. No. 1–2).)  The UWGs list "[l]ogging risks" and "[s]and and gravel operations" as "prohibited risks" that Pelican could not insure under the program.  (SOF ¶¶ 19–20.)  The UWGs also prohibit insuring operators with drivers with specific automobile-related violations, including speeding. (*Id.* at 19.)  Furthermore, the UWGs require Pelican to maintain underwriting files with "minimum" documentation, including a signed ACORD application, rating worksheets, drivers lists, drivers' motor vehicle records ("MVRs"), a loss control survey, and loss runs[1] for the most recent three years.  (*Id.*)  Finally, the UWGs list a number of situations that "require a referral" to Berkley before issuance of insurance coverage, including "accounts outside" of the UWGs, accounts that include a prohibited risk, and "[a]ccounts that have been in business for less than one year without prior experience in similar line of business."  (*Id.*)

## II.    Pelican's Issuance of the Boone Trucking Policy

The UWGs were in effect when, on November 12, 2014, Barry White of Lincoln Insurance Agency ("Lincoln"), an insurance retail agent, sent a "Quick Quote" form to Jan Edwards, a Pelican underwriter, seeking a quote for commercial auto insurance for Kenneth Boone d/b/a Boone Trucking ("Boone Trucking").  (*Id.* ¶ 23; Quotation Sheet (Dkt. No. 29–6).)  The Quick Quote form listed Boone Trucking's hauling operations as consisting of eighty

---

[1] Loss runs list an entity's history of insurance claims.  (SOF ¶ 43.)

percent grain and twenty percent frac sand,[2] Boone Trucking's radius of operations as "100," "State Farm" as Boone Trucking's previous carrier, Boone and Adam McKenzie as Boone Trucking's drivers, and no response to the "Yrs. In Business" question. (SOF ¶¶ 24, 26; *see also* Quotation Sheet.) Based on Boone Trucking's Quick Quote form, Edwards sent a quotation to White on November 13, 2014 providing rates to insure Boone Trucking under Gemini's commercial auto policy. (SOF ¶ 27; Pelican Quotation (Dkt. No. 29–7).) The same day, White sent Edwards a signed application requesting Pelican issue Boone Trucking the quoted Gemini policy for liability, property damage, and cargo coverage. (SOF ¶ 28.) The application included McKenzie's and Boone Trucking's MVRs; Boone's MVR noted a violation dated December 2012 in Louisiana described as "Promise to Appear" with a notation of "**SP." (*Id.* ¶ 33; Boone Trucking Application Applicant Info. (Dkt. No. 29–8) at 17.)[3] Ultimately, Edwards did not investigate Boone's MVR and approved Boone Trucking's application. (SOF. ¶¶ 35, 45–46.)[4] On behalf of Gemini, Pelican issued Boone Trucking a business auto liability and physical damage policy effective November 13, 2014 to November 13, 2015. (*Id.* ¶¶ 45–46; Pelican Boone Trucking Policy (No. PEL0008544) (Dkt. No. 29–9).)

---

[2] Plaintiffs argue the prohibited risk "sand and gravel" in the UWGs includes frac sand, and accordingly, Boone Trucking was not eligible for Gemini's commercial auto policy. (SOF ¶ 37.) Pelican, however, argues frac sand does not fall under the UWG category of "sand and gravel" because "it does not pose the same risk." (*Id.*)

[3] Plaintiffs claim SP could stand for speeding, which would render Boone Trucking a prohibited risk under the UWGs. (SOF ¶¶ 19, 34.) Pelican objects to Plaintiffs' claim and calls this conclusion "speculative." (Def.'s Resp. to SOF (Dkt. No. 32) ¶ 34.)

[4] Pelican objects to SOF ¶ 35, which states "Pelican did not perform any additional investigation to determine what this charge [SP] was for," as "irrelevant and immaterial," arguing "[t]he UWG's speak only to violations and not 'charges.'" (Def.'s Resp. to SOF ¶ 35.) However, Pelican does not cite to any "specific references" in the record to prove Pelican did investigate Boone's MVR. L.R. 56.1(b)(3). Accordingly, for the purpose of our analysis, we take as true Plaintiffs' statement that Pelican did not investigate Boone's MVR at the time of policy issuance.

Laura Johnson, Edwards' assistant at Pelican, sent Lincoln a binder of information about the policy, and requested Lincoln provide Boone Trucking's "current valued loss runs 60 days or newer (prior 3 yrs)."[5] (SOF ¶ 41.) Pelican, however, never received Boone Trucking's loss runs. (*Id.* ¶ 44.)

On December 1, 2014, Twenty First Services, LLC ("Twenty First"), a third party hired by Pelican, conducted an in-person inspection, also known as a loss control survey, of Boone Trucking's headquarters at Boone's home, as required by the UWGs. (*Id.* ¶ 48; *see also id.* ¶ 19 (quoting the UWGs requirement that Pelican conduct a "[p]hysical inspection[] of every location on [sic] new business within 45 days of the effective date of coverage" for risks with heavy vehicles); Boone Dep. (Dkt. No. 29–18) at 60–62.) Twenty First submitted a Loss Control Survey to Pelican, which states Boone Trucking "[h]auls [g]rain 80% and hauls sand 20% of the time," reveals one of Boone Trucking's two trucks had the "critical" issue of a blown engine, and rates the overall risk to be "marginal."[6] (SOF ¶¶ 49–54; Loss Control Survey (Dkt. No. 29–15).) Kenneth Boone testified in his deposition that at the time of this inspection, he was not present. (SOF ¶ 59 (citing Boone Dep. at 62, 68, 216).) Pelican did not follow up with Twenty First about the inspection, and Pelican did no further inspection of Boone Trucking. (*Id.* ¶¶ 54–55.)

On March 4, 2015, Lincoln sent an email to Pelican requesting that B&S Timber, Inc. ("B&S Timber") be added to Boone Trucking's Gemini policy as an additional insured. (*Id.* at 61.) Without review by Edwards or another underwriter, Sarah Chustz, an employee in

---

[5] Edwards understood Boone Trucking to be a pre-existing business, and that Gemini required Pelican to obtain loss runs for Boone Trucking. (SOF ¶ 42.) Edward's Rate Analysis Worksheet for Boone Trucking includes a starred note—"request loss runs." (Rate Analysis Worksheet (Dkt. No. 29–11).)

[6] The Loss Control Survey gives a final "conclusion of the relative strength or weakness of this account" with options of "Unacceptable," "Marginal," "Average," "Good," or "Exceptional." (SOF ¶ 53; Loss Control Survey at 5.)

the processing department at Pelican, issued an endorsement adding B&S Timber as an additional insured the same day.  (*Id.* ¶¶ 61, 63; Endorsement (Dkt. No. 29–19).)

## III.    October 2015 Boone Trucking Accident

On October 1, 2015, while driving a Boone Trucking truck with a load of hardwood pulpwood from Mississippi to Texas, Mark Gordon, a Boone Trucking driver,[7] struck a pickup truck, killing three people and injuring a fourth.  (SOF ¶¶ 68–69.)  As a result of the accident, Gemini was named as a defendant in a number of underlying lawsuits in Louisiana state court and retained counsel to defend itself, Boone Trucking, and Gordon in the state litigation. (*Id.* ¶¶ 73–76.)  After the accident, Pelican learned for the first time that Boone Trucking had been hauling logs, and Pelican cancelled Boone Trucking's Gemini policy.  (*Id.* ¶ 72.)  In a deposition in an underlying lawsuit, Boone testified that he hauled logs at the time he applied for insurance in November 2014, and that he had been hauling logs for twelve years.  (Boone Dep. at 24–27, 216.)  Furthermore, Boone indicated he was not physically present during Twenty First's inspection, and that there were logging trailers on his property at the time.  (SOF ¶ 59.)

## IV.    Procedural History

On May 2, 2016, Plaintiffs filed their amended complaint pursuant to 28 U.S.C. § 1332 seeking damages from Pelican for breach of contract (Count I), contractual indemnification (Count II), negligence (Count III), and negligent misrepresentation (Count IV). (Am. Compl. ¶¶ 39–56.)  Plaintiffs claim that Pelican breached the parties' PAA and UWGs because it issued Boone Trucking's policy without adequately investigating Boone Trucking, did not refer the account to Berkley for approval before underwriting Boone Trucking's policy, failed to maintain adequate underwriting documentation, never reviewed Central Analysis

---

[7] The parties do not dispute that Gordon was not listed as a driver on Boone Trucking's insurance application, and that Lincoln did not know Gordon was driving for Boone Trucking. (Def.'s Statement of Additional Facts ("DSAF") (Dkt. No. 37) ¶ 41.)

Bureau ("CAB") or Safety and Fitness Electronic Records ("SAFER") reports, and failed to adequately inspect Boone Trucking's operations. (*Id.* ¶ 42.) Based on these alleged breaches, Plaintiffs argue Pelican must reimburse Plaintiffs for all costs related to the underlying lawsuits pursuant to the PAA indemnification clauses. (*Id.* ¶¶ 44–46.) Plaintiffs also argue Pelican failed to exercise reasonable care in underwriting Boone Trucking's policy, investigating Boone Trucking's risk, adding the B&S Timber endorsement, and maintaining adequate documentation about Boone Trucking. (*Id.* ¶¶ 47–50.)

Plaintiffs filed a motion for partial summary judgment asserting they have sufficiently proven Pelican's liability on all four counts, but reserving the determination of damages. (Pls.' Summ. J. Mot. ("Mot.") (Dkt. No. 27); Pls.' Mem. in Support of Summ. J. Mot. ("Mem.") (Dkt. No. 30).) In response, Pelican does not dispute it acted as Plaintiffs' agent, but contends summary judgment is inappropriate because "numerous issues of material fact exist surrounding the purported contractual breaches and negligence." (Def.'s Resp. to Mot. for Summ. J. ("Resp.") (Dkt. No. 33) at 2, 5–6.)

## STANDARD OF REVIEW

Summary judgment is proper when "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56. A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). "If the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact," then "the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986) (citing Fed. R. Civ. P. 56). In considering a motion for summary judgment, "[t]he evidence of the

non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor."

*Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513.

## ANALYSIS

Plaintiffs seek summary judgment on their state law breach of contract, indemnification, negligence, and negligent misrepresentation claims, which we consider in turn. As a federal court sitting in diversity, we apply state substantive law and federal procedural law. *Harper v. Vigilant Ins. Co.,* 433 F.3d 521, 525 (7th Cir. 2005). The parties do not dispute that based on the PAA's choice of law clause, Illinois substantive law controls. (Mem. at 6; Resp. at 5.)

## I.    BREACH OF CONTRACT (COUNT I)

Plaintiffs argue "Pelican breached its explicit underwriting limitations under the UWGs and PAA" in issuing Boone Trucking's policy by failing to follow required steps in the underwriting process and ultimately insuring a prohibited logging risk. (Mem. at 9.)

Under Illinois law, "[a] party that fails to perform its contractual duties is liable for breach of contract." *Elda Arnhold & Byzantio, L.L.C. v. Ocean Atl. Woodland Corp.*, 284 F.3d 693, 700 (7th Cir. 2002). To prove a breach of contract claim under Illinois law, plaintiffs must prove (1) the "existence of a valid and enforceable contract"; (2) plaintiff's substantial performance ; (3) breach by the defendant; and (4) damages to the plaintiff as a result of the breach. *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (internal citation omitted) (applying Illinois law). Contract interpretation is a matter of law appropriate for the court. *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008). "Where terms of a contract are clear and unambiguous, they will be given their natural and ordinary meanings." *Berutti v. Dierks Foods, Inc.*, 145 Ill. App. 3d 931, 934, 496 N.E.2d 350, 352 (2d Dist. 1986). In this case, the parties do not dispute the existence of a valid contract, Plaintiffs' performance, or

damages to Plaintiffs; the only element at issue is whether Pelican breached the PAA or UWGs. We consider Pelican's alleged breaches below.

## A. Pelican's Underwriting and Issuance Process

### 1. Failure to Obtain Adequate Underwriting Documentation

We first address Plaintiffs' argument that Pelican violated the PAA by failing to maintain adequate underwriting documentation by failing to obtain a copy of required loss runs. (Mem. at 12–13.) The UWGs require referral to Berkley for any accounts "that have been in business less than one year without prior experience in similar line of business," and require Pelican to maintain "hard copy loss runs for the most recent three years" in each underwriting file. (UWGs at 5.) Loss runs provide a claims history for an insured and provide information to an underwriter to better evaluate the risks associated with an account. (SOF ¶ 43.) Loss runs, however, are unavailable for new ventures because they do not have a prior history of loss. (DSAF ¶ 37.)

It is undisputed that Pelican requested Boone Trucking's loss runs from Lincoln, and that based on Boone Trucking's application, Edwards understood Boone Trucking to be a pre-existing business. (SOF ¶¶ 41–42.) Contemporaneous notes on Edwards' Rate Analysis Worksheet state "request loss runs" with a star notation. (*Id.* ¶ 42.) However, the parties agree that neither Lincoln nor Pelican ever received Boone Trucking's loss runs. (*Id.* ¶ 44; DSAF ¶ 36.) Accordingly, Plaintiffs argue that Pelican's approval of Boone Trucking's application without obtaining loss runs violated the UWGs and contractual documentation requirements. (Mem. at 12.) We agree. While the parties do not address whether Boone Trucking was a preexisting business or new venture in November 2014 in their statements of fact, Boone testified that he had been involved in commercial trucking for years before his application in 2014, and that he had been doing business as Boone Trucking since 2010. (Boone

Dep. at 24, 134–35.)  Accordingly, loss runs existed for Boone Trucking, and Pelican violated the plain language of the UPGs by failing to obtain Boone Trucking's loss runs.

Pelican attempts to argue it did not breach the loss run requirement because Pelican believed in November 2014 that Boone Trucking was a new company with prior experience in a similar line of business.  (Resp. at 9.)  Pelican argues that a new venture with previous experience requires no further action: a new venture would not have any loss runs to obtain, and a new venture with prior experience would not require referral to Berkley under the UWGs.  (*Id.*; Def.'s Resp. to SOF (Dkt. No. 32) ¶ 44; DSAF ¶ 37.)  Pelican's corporate representative, Patrick Kelly, testified that it "was [Pelican's] interpretation" that Boone Trucking was a new venture, and accordingly did not need to obtain loss runs before binding Boone Trucking's policy.  (Kelly Dep. (Dkt. No. 29–2) at 72–76.)  Further, on the Quick Quote form, the "Yrs. in Business" question is left unanswered.  (Quotation Form.)

However, the evidence in the record shows Boone Trucking was not a new venture, which Pelican knew when it processed Boone Trucking's application.  Kelly was not involved in the underwriting of Boone Trucking's application, and the underwriter who did process Boone Trucking's application, Edwards, believed Boone Trucking was a preexisting business with loss runs because Boone Trucking indicated it had prior insurance on its application.  (Kelly Dep. at 74; SOF ¶ 42.)  Edwards reiterated that she believed Boone Trucking was a preexisting business during her deposition testimony based on Boone's nine years of experience and disclosure of prior insurance on the initial Quick Quote form.  (Edwards Dep. (Dkt. No. 29–4) at 58–59; Quotation Form (listing "State Farm" as Boone Trucking's previous insurance carrier); *see also* Lanier Dep. (Dkt. No. 29–12) at 82 ("[Boone Trucking] was not a new business venture because the form stated that he had prior insurance with State Farm.").)  Edwards' understanding explains why Pelican requested the loss runs from Lincoln in the first place.

More importantly, any argument that Pelican did not have knowledge it was breaching the UWGs by not obtaining loss runs does not preclude summary judgment for Plaintiffs because "liability for breach of contract is, prima facie, strict liability." *Patton v. Mid-Continent Sys., Inc.*, 841 F.2d 742, 750 (7th Cir. 1988) ("[I]f the promisor fails to perform as agreed, he has broken his contract even though the failure may have been beyond his power to prevent and therefore in no way blameworthy."). Even if we assume Pelican could prove it believed Boone Trucking was a new venture with prior experience that was exempt from both the loss run and referral requirements under the UWGs, Pelican's knowledge and intent are irrelevant to whether it breached the agreements. *Winniczek v. Nagelberg*, 394 F.3d 505, 509 (7th Cir. 2005) ("Since liability for breach of contract is, in general, strict liability, the cause, character, and mental element of the breach usually are immaterial.") (internal citations omitted) (citing Illinois law). Accordingly, because the record establishes there is no dispute that Boone Trucking was not a new venture, Pelican breached its contract with Plaintiffs by failing to obtain loss runs for Boone Trucking.

### 2. Failure to Review Boone Trucking's CAB or SAFER Reports

Plaintiffs next argue Pelican breached the PAA and UWGs by not obtaining and reviewing Boone Trucking's CAB or SAFER reports. (Mem. at 10–11.) Plaintiffs admit, however, that the 2013 UWGs do not require Pelican to obtain a CAB or SAFER report. (Resp. to DSAF (Dkt. No. 37) ¶ 28; Mem. at 10.) Based on this admission, and the absence of any mention of CAB or SAFER reports in the UWGs, we agree with Pelican that it did not breach its contract with Plaintiffs by failing to consider Boone Trucking's CAB or SAFER reports.

### 3. Failure to Adequately Investigate Boone Trucking's Operations

Finally, Plaintiffs allege Pelican breached the PAA and UWGs by failing to adequately investigate Boone Trucking. (Am. Compl. ¶ 42.) While Plaintiffs provide extensive arguments

about Pelican's duty to inspect and analyze Boone Trucking's risk, its arguments seemingly pertain to their negligence claim; Plaintiffs do not indicate which provision of the PAA or UWGs Pelican allegedly violated. Pelican met its only specific inspection requirement in the first year of coverage by conducting a physical inspection of Boone Trucking "within 45 days of the effective date of coverage" and maintaining a loss control survey based on that inspection. (UWGs at 4–5; SOF ¶¶ 19, 48.) We agree with Pelican that "Plaintiffs are now challenging the adequacy of [Pelican's] inquiry, but not whether one was made." (Resp. at 7.) Accordingly, Plaintiffs have not proven Pelican's inspection of Boone Trucking constituted a contractual breach.

### B. Insuring a Prohibited Risk

We now consider Plaintiffs' argument that Pelican also breached the UWGs by insuring a prohibited risk. There is no dispute that under the terms of the PAA and UWGs, Pelican was specifically prohibited from issuing Gemini policies to companies with "[s]and and gravel operations" or "[l]ogging risks." (SOF ¶ 19.) Plaintiffs argue it is also undisputed Boone Trucking represented such a prohibited risk.

The record irrefutably demonstrates that Boone Trucking hauled logs at the time Pelican bound it to Gemini's policy and throughout the duration of Boone Trucking's coverage. In his deposition testimony in November 2016, Boone testified he had been hauling logs "[p]retty much from the start" of Boone Trucking, and that he had hauled logs for twelve years. (Boone Dep. at 24–27 (estimating hauling logs or timber constituted twenty to eighty percent of Boone's annual business, varying by year).) Boone also testified that when Twenty First conducted its loss control inspection of Boone Trucking, there were multiple logging trailers on his property. (*Id.* at 62.) In addition, the Boone Trucking SAFER report from November 15, 2015 indicated Boone Trucking carried cargo of "Logs, Poles, Beams, Lumber." (Dkt. No. 29–17.) Multiple

Lincoln employees testified they learned Boone Trucking had been hauling logs after the October 1, 2015 accident. (*See* Lanier Dep. at 43; White Dep. (Dkt. No. 29–13) at 61–63.) Finally and most significantly, Pelican acknowledges that "when it found out Boone hauled logs" after the October 2015 accident, it cancelled the Boone Trucking policy. (Def.'s Resp. to SOF ¶ 72.) Pelican's admission combined with the deposition testimony and SAFER documentation establishes that Boone Trucking hauled logs and represented a prohibited logging risk both when Boone Trucking applied for coverage in November 2014 and during the policy's coverage; therefore, Pelican breached the unambiguous terms of the UWGs when it bound Boone Trucking to a Gemini policy. (*See* Resp. to SOF ¶ 20 ("Pelican admits that if risks fell within any of the categories listed under the 'Prohibited risks' of the UWGs, Pelican cannot write the risk for the Program."); *see also* SOF ¶ 60 ("Edwards testified that had she known Boone was hauling logs, she would not have bound coverage for this account.").)

Nevertheless, in its response, Pelican asserts that it could not have breached the agreement because "[n]o one involved with writing or issuing the Boone insurance policy knew that Boone was hauling logs" when the policy was underwritten and issued. (Resp. at 6.) As established above, the relevant question for purposes of establishing a breach is not whether anyone at Pelican knew that Boone Trucking hauled logs, but whether Boone Trucking in fact hauled logs. *See, e.g.*, *Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 279 (7th Cir. 1992) ("Liability for breach of contract is strict.") (applying Illinois law); *Canal Barge Co. v. Commonwealth Edison Co.*, No. 98 C 0509, 2002 WL 1264002, at *6 (N.D. Ill. June 3, 2002) ("Fault is irrelevant to breach of contract.") (citing *Album Graphics, Inc. v. Beatrice Foods Co*., 87 Ill. App. 3d 338, 350, 408 N.E.2d 1041, 1050 (1st Dist. 1980).

In sum, there is no dispute amongst the parties as to whether Boone Trucking hauled logs, no dispute that hauling logs represented a "prohibited risk" under the UWGs, and therefore no dispute of material fact as to Pelican's breach.[8] While Pelican could have avoided a breach of the UWGs by referring the Boone Trucking application to Gemini for approval, it attempted no such referral in this case.

*　　*　　*

Based on the parties' pleadings, depositions, and admissions, we find no genuine dispute of any material fact as to whether Pelican materially breached its explicit underwriting limitations when it (1) failed to obtain loss runs for Boone Trucking and (2) ultimately bound coverage for Boone Trucking, a prohibited logging risk under the terms of the PAA and UWGs. (Mem. at 9; SOF ¶¶ 15, 19.) *See also Celotex*, 477 U.S. at 322, 106 S. Ct. at 2552. Accordingly, we grant Plaintiffs' motion for summary judgment on their breach of contract claim (Count I).

## II.    CONTRACTUAL INDEMNIFICATION (COUNT II)

Having established that Pelican breached its contract with Plaintiffs, we turn next to the question of whether Pelican must indemnify Plaintiffs for their expenditures caused by issuance

---

[8] Plaintiffs also claim that by binding "coverage for a risk that hauled frac sand" Pelican violated the UWGs, which prohibit hauling of sand and gravel. (Mot. at 4.) The parties do not dispute that Boone Trucking disclosed in its application that it hauled frac sand, and that there was never a referral or even a discussion between Berkley and Pelican as to whether sand operations include frac sand hauling and accordingly whether frac sand hauling was prohibited under the UWGs. (SOF ¶¶ 24, 40.) The parties do dispute, however, whether frac sand falls under the prohibited risk of sand and gravel. (Resp. to SOF ¶¶ 37–40.) Pelican asserts frac sand does not pose the same risk as sand and gravel, and accordingly frac sand was an allowable risk under the UWGs. (*Id.* ¶ 37.) The parties' witnesses offer conflicting testimony on the issue. (*Compare* Bourret Dep. (Dkt. No. 29–10) at 76–77, 85 (explaining that frac sand is a type of sand and is prohibited by the UWGs); *with* Gulley Dep. (Dkt. No. 29–3) at 108 (stating it is "common practice" to allow frac sand hauling when guidelines only prohibit sand and gravel hauling) *and* Tilden Dep. (Dkt. No. 29–16) at 66–67, 96–100 (suggesting frac sand and sand hauling pose different risks based on the materials' weight and shifting, and require different trailers to haul them).) The UWGs and the evidence in the record are ambiguous on this issue, and viewing the evidence in the light most favorable to Pelican, a material issue of fact exists as to whether the UWGs prohibited insuring risks that haul frac sand.

of the Boone Trucking policy. Plaintiffs argue that, "[p]ursuant to the PAA's indemnity provisions, if Pelican underwrites or binds policies prohibited by the UWGs without prior written approval from BPS, whether intentional or not, BPS is entitled to contractual indemnity from Pelican for all losses incurred as a result thereof." (Mem. at 3.) Pelican does not directly respond to Plaintiffs' indemnification claim beyond arguing a material issue of fact exists as to whether Pelican breached the UWGs. (Resp. at 6–7.)

Under Illinois law, "an indemnity agreement is a contract and is subject to contract interpretation rules." *Buenz v. Frontline Transp. Co.*, 227 Ill. 2d 302, 308, 882 N.E.2d 525, 528 (Ill. 2008) (citation omitted). "The cardinal rule of contract interpretation is to discern the parties' intent from the contract language. Where the contract language is unambiguous, it should be given its plain and ordinary meaning." *Id.*, 227 Ill. 2d at 308, 882 N.E.2d at 528–29 (internal citation omitted).

Here, there is no dispute that Pelican entered into an indemnity agreement, as the PAA contains multiple indemnification clauses. (*See generally* Resp. to SOF ¶ 15.) Specifically, under Section 3.2, Pelican "shall indemnify and hold the Company [Gemini] harmless for any and all payments that the Company may be required to make under policies which are prohibited by Section 3.1." (SOF ¶ 15.) Section 8.2 further requires Pelican to

> defend, indemnify, and hold Company harmless from and against all claims, actions, causes of action, liability, or loss which result from any real or alleged negligent or willful acts, errors, or omissions or [sic] Administrator . . . in the performance or breach of duties under this Agreement, including but not limited to . . . quoting, underwriting, and/or binding policies prohibited under Section 3.1. (*Id.*)

Section 3.1 includes "risks which are unacceptable in accordance with this Agreement, or the underwriting guidelines . . . ." (*Id.*)

Pelican does not dispute the language of the provision, nor does it offer any argument against indemnification in the event of a breach. (SOF ¶ 15.) As previously established, Pelican

bound a policy prohibited under the UWGs and Section 3.1 when it underwrote and bound

Boone Trucking's policy, triggering the indemnity requirements of PAA Sections 3.2 and 8.2.

Accordingly, BPS is entitled to summary judgment on its indemnification claim (Count II).

## III.  NEGLIGENCE (COUNT III)

Plaintiffs also allege that Pelican was negligent in underwriting and issuing the policy for

Boone Trucking—a logging risk—in violation of the prohibited risks section of the UWGs.[9]

(Am. Compl. ¶¶ 47–50.)  However, viewing the record in the light most favorable to Pelican, we

find there are genuine issues of material fact as to Pelican's duty of care to Plaintiffs and whether

Pelican met that duty that preclude summary judgment.

In recognizing negligence as a common law claim, Illinois has adopted the Restatement

(Second) of Torts § 414 (1965).  *See generally Bokodi v. Foster Wheeler Robbins, Inc.*,

312 Ill. App. 3d 1051, 1059, 728 N.E.2d 726, 732 (1st Dist. 2000).  Under § 414, to prove a

common law negligence claim, a plaintiff must establish that (1) the defendant owed a duty to

the plaintiff, (2) the defendant breached that duty, and (3) the plaintiff suffered a compensable

---

[9] Typically, Illinois' economic loss doctrine prohibits recovery in tort for purely economic losses.  However, in service industries, the economic loss doctrine only limits tort recovery "where the duty of the party performing the service is defined by the contract between him and his client."  *Kanter v. Deitelbaum*, 271 Ill. App. 3d 750, 754, 648 N.E.2d 1137, 1139 (1st Dist. 1995) (citing *Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 159 Ill. 2d 137, 161–62, 636 N.E.2d 503, 513–14 (Ill. 1994).  "When a duty arises outside of that contract," the economic loss doctrine does not limit recovery under a tort theory.  *Id.* (finding insurance broker, like an attorney or accountant, owed insured fiduciary duties because insured relied on broker's "knowledge and expertise" that are not defined by a contract or policy).  We find the economic loss doctrine does not prohibit tort recovery against Pelican because its duty as an agent to Plaintiffs is not fully defined by the PAAs and UWGs.  *Id.*; *see also Neumann v. Carlson Envtl., Inc.*, 429 F. Supp. 2d 946, 952–53 (N.D. Ill. 2006) (denying motion to dismiss negligence claim against an environmental consultant based on the economic loss doctrine because the consultant's "particularized knowledge and expertise gave rise to a duty independent of its contract with plaintiffs . . . and because the primary service provided to plaintiffs was intangible"); *State Auto. & Cas. Underwriters v. Salisbury*, 494 P.2d 529, 531 (Utah 1972) (finding duties of agent to insurer arise out of contractual agreements in addition to "customs and experience" of the parties, even if those terms are not explicitly in the contract).

injury proximately caused by the defendant's breach. *Id.* Whether a duty of care exists is ordinarily a question of law for the court to decide, while breach and proximate cause are questions of fact for the factfinder. *See Iseberg v. Gross*, 227 Ill. 2d 78, 87, 879 N.E.2d 278, 284 (Ill. 2007); *see also Camp v. TNT Logistics Corp.*, 553 F.3d 502, 505–06 (7th Cir. 2009). The court may grant summary judgment, however, if the breach of duty is obvious from the undisputed facts. *Gipson v. United States,* 631 F.3d 448, 452 (7th Cir. 2011) (recognizing that failure to tell an inmate that aspirin is a blood thinner and that he needed to stop taking it at least five days before his surgery was "so obvious [a breach of the standard of care] that [plaintiff] should have been able to move successfully for partial summary judgment . . . .").

In the present case, neither party disputes that an agency relationship existed between Berkley, as principal, and Pelican, as agent. (SOF ¶ 65; Resp. to SOF ¶ 65; Resp. to Mot. at 5.) "An insurance agent is one who has a fixed and permanent relation to the companies he represents and who has certain duties and allegiances to such companies." *Allied Am. Ins. Co. v. Ayala*, 247 Ill. App. 3d 538, 551, 616 N.E.2d 1349, 1360 (2d Dist. 1993). As Berkley's agent, under Illinois law, Pelican owed Berkley "a duty of care, competence, and skill in performing all aspects of the insurance transaction." *Bellmer v. Charter Sec. Life Ins. Co.*, 105 Ill. App. 3d 234, 239, 433 N.E.2d 1362, 1366 (4th Dist. 1982).

Having established that a duty existed, we turn next to the question of whether Pelican breached its duty of care to Plaintiffs. In its motion for summary judgment, Plaintiffs claim Pelican breached its duty of care "throughout the underwriting and binding process, as well as during the [Boone Trucking] Policy term." (Mot. at 3–4.) In support of this argument, Plaintiffs point to "a myriad of opportunities" during which Pelican allegedly could and should have discovered that Boone Trucking represented a prohibited risk under the UWGs before the October 2015 accident. (*Id.*) Plaintiffs argue that Pelican's behavior in the handling of Boone

Trucking's policy "amounted to a complete and utter failure to comply with its . . . common law duties." (Reply (Dkt. No. 36) at 2.) In response, Pelican disputes a number of the facts Plaintiffs offer in support of their argument, and insists there "are material questions of fact" as to whether it violated its duty of care. (Resp. at 5–10.) We consider a number of Plaintiffs' arguments below.

First, Plaintiffs argue Pelican should have discovered Boone Trucking hauled logs during the underwriting process had they adequately investigated. (Mem. at 9–10.) Plaintiffs take particular issue with Pelican's failure to run a SAFER or CAB report[10] or to further investigate Boone Trucking beyond the loss control inspection, which Plaintiffs argue would have identified Boone Trucking's log hauling operations. (Mem. at 10–11.) Plaintiffs also point to the fact that Boone testified he had been hauling logs for years when he applied for coverage through Pelican, that there were logging trailers on his property during the inspection of the premises, and that Boone was not physically present during Twenty First's inspection. (SOF ¶ 59.) Pelican, however, argues that that the SAFER and CAB reports were not required by the UWGs,[11] Boone and Lincoln never disclosed facts about Boone Trucking's hauling of logs, and that pictures taken by the company hired to conduct the inspection fail to show any logging trailers. (Resp. at 6–7.) Pelican further argues that by initiating the physical inspection of Boone Trucking, it conducted a "reasonable inquiry." (*Id.* at 7.) Viewing the evidence in the light most

---

[10] As previously established, Plaintiffs admit the UWGs do not require Pelican to run SAFER or CAB reports, but argue "it was Pelican's duty of reasonable care owed as BPS' agent, a duty separate and apart from its contractual obligations owed under the UWGs and PAA" that required Pelican to consider the reports. (Reply at 7.)

[11] The parties also argue about whether Pelican could have run a CAB or SAFER report for Boone Trucking during Pelican's review of Boone Trucking's application: Pelican argues it needed an MC number to run the reports, while Plaintiffs argue the reports could have been conducted with only Boone Trucking's name. (Resp. at 8; Mem. at 10–11.) Pelican also argues it is unclear whether the reports would have actually indicated Boone Trucking was hauling logs when the policy was issued, as the backdated reports cannot be retrieved. (Resp. at 8; SOF ¶ 58.)

favorable to Pelican, there is a material issue as to whether Pelican failed to meet its duty of care in the investigation of Boone Trucking.

Second, Plaintiffs allege that Pelican breached its duty of care when it chose to quote and bind coverage for Boone Trucking despite Boone Trucking acknowledging on its Quick Quote form and insurance application that it hauled "frac sand," which Plaintiffs argue falls under the prohibited risk of sand and gravel operations under the UWGs. (Mem. at 11; SOF ¶ 24, 29.) Plaintiffs argue the possibility frac sand constituted a prohibited risk at least required Pelican to seek clarification from Berkley instead of unilaterally approving the application without a referral. (Mem. at 12.) Pelican, however, disputes whether "frac sand" falls within the category of "sand and gravel" under the prohibited risks section of the UWGs. (Resp. to Mot. at 8.) To further complicate the issue, Plaintiffs argue that Pelican should have further investigated Boone Trucking's operations after Pelican's loss control investigation listed Boone Trucking as hauling "sand," instead of "frac sand," which Pelican admits is a prohibited risk. (Mem. at 12; SOF ¶ 51.) Based on this contradictory evidence, we find a material dispute as to whether Pelican adequately investigated whether frac sand was a prohibited risk under the UWGs.

Third, Plaintiffs allege Pelican negligently failed to fully investigate the "SP" notation on Kenneth Boone's MVRs. (SOF ¶¶ 33–35.) The UWGs require Pelican to obtain MVRs for all drivers, and to conduct "a full analysis of the driving records" to ensure the drivers do not pose prohibited risks based on previous violations. (*Id.* ¶¶ 19, 41.) Plaintiffs suggest, and Pelican's primary underwriter agrees, that "'SP' could possibly stand for speeding," and employing a driver with a record of speeding constitutes a prohibited risk under the UWGs. (*Id.* ¶¶ 19, 34.) Pelican, however, argues it had no duty to further investigate Boone's MVRs, as the meaning and significance of the "SP" notation is neither clear, nor established anywhere in the record. (Resp. at 9–10.) Pelican also asserts that a "promise to appear" is not a "violation" as

contemplated by the UWGs, and was "not that significant." (*Id*. at 10; Resp. to SOF ¶ 35.) Viewing the record in Pelican's favor, we find an issue of fact as to Pelican's duty to investigate the notations in Boone's MVRs.

Fourth, Plaintiffs argue that Pelican breached its duty of care when it endorsed B&S Timber to the Boone Trucking policy months before the October 2015 accident. (Mem. at 10.) Plaintiffs take issue with the endorsement being processed by an administrative assistant instead of an underwriter. (*Id*.) Plaintiffs have not established, however, that Pelican's duty as Plaintiffs' agent required an underwriter to review or process endorsement requests.

Plaintiffs further argue that after the endorsement request, Pelican should have conducted further investigation into Boone Trucking's operations or cancelled Boone Trucking's policy altogether after receiving the request to add an endorsement for an apparent timber company. (*Id*. (citing SOF ¶¶ 61, 63–67).) Plaintiffs cite Edwards' deposition testimony, where she admitted the request to add B&S Timber raised a "red flag" that Boone Trucking may have hauled timber and should have triggered further investigation. (Mem. at 10; SOF ¶ 64.) Alternatively, Plaintiffs argue that Boone Trucking's application to add a timber company should have at least sparked Pelican's concern, as Boone Trucking had only previously indicated it hauled frac sand and grain, not timber. (Reply at 6; Mem. at 9–10 (arguing Pelican should have "confirm[ed] Boone actually hauled the commodities represented on its Application").) Pelican counters the endorsement request did not necessarily mean Boone Trucking was hauling logs, as "the UWGs do not prohibit 'timber' as a commodity." (Resp. at 7.) We recognize that an agent can breach its duty to an insurer by failure to investigate a known prohibited risk. *See, e.g.*, *Nowell v. Union Mut. Fire Ins. Co.*, 409 A.2d 784, 786 (N.H. 1979) (affirming finding agent liable to insurer after it did nothing to investigate whether insured home was occupied, a requirement of the policy, despite being "on notice" that the home was being renovated); *State*

*Auto. & Cas. Underwriters v. Salisbury*, 494 P.2d 529, 233 (Utah 1972) (upholding the finding

that an agent or insurer violated duty of care to insurer by issuing policy for a prohibited risk

because the agent had "enough notice to require it to inquire about the prohibition").  However,

considering the evidence in Pelican's favor, we find a material issue of fact as to whether Pelican

breached its duty to the Plaintiffs in its handling of the B&S Timber endorsement application.

Given the totality of the record, Plaintiffs argue Pelican took a number of troubling

actions in the underwriting and issuance of Boone Trucking's policy.  However, viewing the

evidence in a light most favorable to Pelican, and construing all reasonable inferences in its

favor, a jury could find that Pelican acted with reasonable diligence in underwriting, binding, and

administering Boone Trucking's policy.  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also*

"Negligence," 4 Couch on Ins. § 54:6 ("Cases involving these issues [negligence of an insurer's

agent] generally proceed to trial because the factual disputes have to be resolved by a jury.").

We thus deny Plaintiffs' motion for summary judgment on its negligence claim (Count III).

## IV.    NEGLIGENT MISREPRESENTATION (COUNT IV)

Finally, Plaintiffs seek summary judgment on their negligent misrepresentation claim.

Plaintiffs allege that they "justifiably relied on false and/or omitted information obtained by

Pelican . . . during the underwriting of the [Boone Trucking] Policy," and that as a result of this

reliance, Plaintiffs insured a prohibited risk, and incurred and will continue to incur damages.

(Am. Compl. ¶¶ 51–56; *see also* Reply at 2.)  Plaintiffs specifically argue that Pelican failed to

obtain or investigate material information about Boone Trucking's hauling operations, its

drivers' MVRs, and prior violations related to truck maintenance.  (Am. Compl. ¶¶ 57–58.)

Under Illinois law, to succeed on negligent misrepresentation claim, a plaintiff must

prove: (1) a false statement of material fact, (2) defendant's carelessness or negligence in

ascertaining the truth of the statement , (3) an intention to induce the other party to act, (4) action

by the plaintiff relying on the truth of the statement, (5) damage to the plaintiff resulting from the reliance, and (6) a duty owed by defendant to plaintiff to communicate accurate information. *Quinn v. McGraw-Hill Cos. Inc.,* 168 F.3d 331, 335 (7th Cir. 1999) (citing *Rosenstein v. Standard & Poor's Corp.*, 264 Ill. App. 3d 818, 821, 636 N.E.2d 665, 667 (1st Dist. 1993)).

Establishing that Pelican was negligent in ascertaining the truth about Boone Trucking's status as a prohibited risk is a necessary element of negligent misrepresentation.[12] *Id.* As we have already determined that there is a genuine dispute of material fact as to Plaintiffs' negligence claim, it is not possible at this stage for Plaintiffs to meet the second element of a negligent misrepresentation claim. In addition, Plaintiffs have failed to establish any action taken by Plaintiffs in reliance on Pelican's alleged misrepresentations about Boone Trucking's operations, as the parties agree that Pelican, not Plaintiffs, ultimately underwrote and issued Boone Trucking's policy. (*See* SOF ¶ 46.) Plaintiffs, therefore, cannot make out a prima facie case for negligent misrepresentation. *Celotex*, 477 U.S. at 331, 106 S. Ct. at 2557 ("The burden of production imposed by Rule 56 requires the moving party to make a prima facie showing that it is entitled to summary judgment."). Accordingly, we deny Plaintiffs' motion for summary judgment on its negligent misrepresentation claim (Count IV).

---

[12] Carelessness and negligence seemingly have the same meaning under Illinois tort law. *Pendowski v. Patent Scaffolding Co.*, 89 Ill. App. 3d 484, 492, 411 N.E.2d 910, 916 (1st Dist. 1980) ("[A] count in ordinary negligence will indicate that defendant acted 'carelessly.'").

**CONCLUSION**

For the reasons stated above, Plaintiffs' motion for summary judgment with respect to

Counts I and II is granted and denied with respect to Counts III and IV.  It is so ordered.

_____
Honorable Marvin E. Aspen
United States District Judge

Dated: June 6, 2018
        Chicago, Illinois